**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TONI L. QUEEN, | : | |
| Plaintiff | : | CIVIL ACTION NO. 1:05-1307 |
| v. | : | (CONNOR, D.J.) |
| | | (MANNION, M.J.) |
| JO ANNE B. BARNHART, Commissioner of Social Security, | : | |
| | : | |
| Defendant | : | |

## REPORT AND RECOMMENDATION

The record in this action has been reviewed pursuant to 42 U.S.C. §405(g) to determine whether there is substantial evidence to support the Commissioner's decision to deny the plaintiff's claim for Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), respectively. 42 U.S.C. § 1381-1383f.

**I. Procedural Background**

The plaintiff protectively filed an application for SSI on November 8, 2000, alleging disability since October 23, 2000 due to shortness of breath, dizziness, and chest pains. (TR. 201, 232). After the plaintiff's claim was denied initially, she requested and was granted a hearing before an administrative law judge. ("ALJ"). (TR. 24, 116-119, 113). The plaintiff, her daughter, and a vocational expert ("VE") testified at the May 2, 2002 hearing.

(TR. 24-60). The ALJ issued a decision on August 15, 2002, denying the plaintiff's claims. (TR. 99-106).

The plaintiff requested review of the ALJ's decision. (TR. 137). The Appeals Council granted review and remanded the case to the ALJ with instructions to give further consideration to the treating source opinions, obtain additional evidence concerning the plaintiff's mental impairment, and re-evaluate the plaintiff's credibility. (TR. 159-62). A hearing was held before the same ALJ on January 15, 2004, at which time the plaintiff, her mental health case worker, and a VE testified. (TR. 61-93). The ALJ again issued an unfavorable decision on July 26, 2004. (TR. 12-23). On May 11, 2005, the Appeals Council denied the plaintiff's request for review of the ALJ's decision. (TR. 5,10-11). Thus, the ALJ's decision became the final decision of the Commissioner. 42 U.S.C. § 405(g). Currently pending is the plaintiff's appeal, filed on June 29, 2005, of the Commissioner's decision. (Doc. No. 1).

## II. Disability Determination Process

A five-step process is required to determine if a claimant is disabled under the Act. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work, and; (5) whether the claimant's impairment prevents the claimant from doing any other work. 20 C.F.R.

§ 416.920.

The instant case was ultimately decided at the fifth step of the process, when the ALJ concluded, given the plaintiff's age, educational background, work experience, and residual functional capacity ("RFC"), that she was capable of making a successful adjustment to work that existed in significant numbers in the national economy. (TR. 21-22).

## III.  The ALJ's decision

Using the above-outlined procedure, the ALJ found that (1) the plaintiff had not engaged in substantial gainful activity since the alleged onset of disability; (2) the plaintiff's impairments, valvular heart disease post-mitral valve replacement, hepatitis C, chronic obstructive pulmonary disease, and schizoaffective disorder, were "severe" under 20 C.F.R. § 416.920(c), but (3) did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4; (4) the plaintiff was unable to perform her past relevant work as a warehouse janitor and housekeeper because those jobs were performed at the medium and heavy exertional levels, but; (5) the plaintiff had the RFC to perform a significant range of light work.[1] (TR. 17-22).

---

[1] Specifically, the ALJ found the plaintiff had the RFC to: lift, carry, push, and pull ten pounds frequently and twenty pounds occasionally; sit six hours in an eight-hour day; and walk and stand six hours in an eight-hour day. (TR. 20-21). The ALJ also found that the plaintiff had mild to moderate limitations in her abilities to concentrate, pay attention, and interact with others. (TR. 21).

The ALJ determined, by relying on the VE's testimony, that the plaintiff could perform light, unskilled work as an inspector, a hostess, or an examiner, jobs that existed in significant numbers in the national economy. (TR. 22). 20 C.F.R. § 416.920(f). Thus, the ALJ determined that the plaintiff was not disabled under the Act. (TR. 22-23). 20 C.F.R. § 416.920(f).

The ALJ also found that the plaintiff was not fully credible with respect to her symptoms and limitations, and therefore gave the plaintiff's testimony limited weight in establishing her RFC. (TR. 18).

## IV.  Evidence of Record

The plaintiff was forty-eight-years-old, a "younger" individual under the Act, at the time of the ALJ's decision. (TR. 21). 20 C.F.R. § 416.963. She has an eleventh grade education and past relevant work experience as a warehouse janitor. (TR. 232-33).

The plaintiff has not worked since October 23, 2000, when she started having breathing problems, chest pains, and fatigue. (TR. 232). She was admitted to the hospital on October 27, 2000, for exertional dyspnea[2] and chest pressure. (TR. 268). The plaintiff admitted to a history of smoking, as well as, alcohol and crack cocaine abuse, and revealed that she had used crack cocaine for the last time two to three weeks earlier. *Id.* The plaintiff was

---

[2] Dyspnea is defined as air hunger resulting in labored or difficult breathing, sometimes accompanied by pain. It is normal when due to vigorous work or athletic activity. *Tabers Cyclopedic Medical Dictionary* 653 (20th ed. 2005).

4

diagnosed with mild mitral regurgitation,[3] shortness of breath, and chest pain. She was treated and released. (TR. 268-69). In March 2001, Dr. Michael F. Hilden completed a state welfare form indicating that the plaintiff was temporarily disabled, from March 1, 2001 to March 1, 2002, due to mitral stenosis. He opined that she would need a mitral valve replacement in the near future. (TR. 276-77).

Indeed, by May 2001, the plaintiff's symptoms, shortness of breath and chest tightness, were more prominent. (TR. 274). At this time, she was diagnosed with moderately severe mitral stenosis and moderate mitral valve regurgitation. As a result, she underwent mitral valve replacement surgery. (TR. 274-75). In an August 2001 follow-up evaluation, the plaintiff reported that her breathing was much better than before the surgery and that she had no chest pain. (TR. 331). Dr. Mark Osevala, a cardiologist, noted that she was doing quite well, with crisp valve sounds and normal sinus cardiac rhythm. (TR. 331).

A follow-up stress test in December 2002, however, showed very poor exercise tolerance due to dyspnea. (TR. 371). In February 2003, Dr. Stephen Sloan opined that the plaintiff's poor exercise tolerance was due to poor physical conditioning and recommended that she quit cigarette smoking, lose weight, and increase her level of physical activity. (TR. 370).

---

[3] Mitral valve regurgitation is a condition in which the mitral valve does not close tightly, which allows blood to flow backwards in the heart. *See* http://www.mayoclinic.com/health/mitral-valve-regurgitation/DS00421.

The plaintiff also alleges a mental impairment, and in fact notes that the Appeals Council remanded the case to the ALJ to obtain and consider additional evidence concerning the plaintiff's depression. (TR. 69, 161). In December 2001, the plaintiff was admitted, for partial hospitalization, by the Dauphin County Mental Health/Mental Retardation Case Management Unit. (TR. 336). The plaintiff denied suicidal ideations but stated that she wished she wouldn't wake up. (TR. 341). The plaintiff also admitted to having thoughts of setting people on fire, although she stated that she didn't want to hurt anyone, and to a history of assaultive behavior, including incarcerations for assault with a deadly weapon and burglary. (TR. 341-42, 346, 366). The plaintiff also reported sleep problems, feared being alone at night, and felt people were out to hurt her. (TR. 341). The plaintiff thereafter attended outpatient counseling. (TR. 355).

During 2002, the plaintiff was also treated by psychiatrist Dr. Rizalino Coronado, who prescribed Effexor and Resperdal. (TR. 359). In April 2002, Dr. Coronado reported that the plaintiff was afraid of people, extremely anxious, and readily admitted to visual and auditory hallucinations. (TR. 398). The plaintiff was unable to add a penny, nickel, dime, and quarter or spell the word "chair." *Id.* She also had the current date, year, and day wrong. *Id.* Dr. Coronado noted that the plaintiff said she hated everybody, and closed up her house so no one could peek in. (TR. 397). Dr. Coronado diagnosed major depression, recurrent with psychotic disorder, personality disorder with anti-social features, assessed a GAF (Global Assessment of Functioning) score

6

of thirty-five [4], and added a new medication to help control the plaintiff's psychoses. (TR. 399).

In October 2002, Dr. Coronado filled out a medical source statement regarding the plaintiff's ability to do work-related mental activities. (TR. 360-61). Dr. Coronado opined that the plaintiff had either "marked " or "extreme" degrees of limitation in all listed work-related mental activities, and wrote that the plaintiff was "incapable of utilizing good judgment in her decision-making" due to schizoaffective disorder and mood disorder. (TR. 360-61). Dr. Coronado also wrote that the plaintiff had a persistent history of extreme anti-social behavior that resulted in violent aggression and anti-social interactions. (TR. 361).

In June 2003, the plaintiff was evaluated by psychiatrist Dr. Mark Heinly. (TR. 362, 365-69). The plaintiff reported that she had several medical problems in the past few years, and that her depression seems to have worsened in response. (TR. 365). She also described paranoia-type symptoms, such as keeping her shades drawn and thinking there was someone in her house at night. *Id.* The plaintiff also stated that she heard voices, did not like being around people, and had intermittent thoughts of wanting to harm people. (TR. 365, 367). She denied current illicit drug use. (TR. 367). She reported being on several different medications in the past,

---

[4] A GAF score of thirty-five indicates major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. text revision, 2000) (DSM).

7

and noted that Dr. Coronado had recently increased her Effexor dose. (TR. 366). Dr. Heinly diagnosed schizoaffective disorder, depressed type, and alcohol and cocaine dependence in full sustained remission. (TR. 368). Dr. Heinly assessed a GAF score of forty-five[5] and started the plaintiff on Seroquel, which she had previously taken while incarcerated. (TR. 368, 366).

In August 2003, Dr. Heinly reported that the plaintiff was not homicidal but had violent thoughts when around people who annoyed her. (TR. 363). The plaintiff told Dr. Heinly that she slept with a meat cleaver and an axe by her bed and was always worried someone would hurt her. (TR. 363). She told Dr. Heinly that she was up most of the night and slept periodically during the day. *Id*. The plaintiff reported that her daughter did all the shopping and that she did not enjoy any activities outside the home. *Id.* In September 2003, Dr. Heinly filled out a state welfare form indicating that the plaintiff was unable to work. (TR. 413-14).

In September 2004, Dr. Heinly filled out a medical source statement regarding the plaintiff's ability to do work-relates mental activities. (TR. 404-05). Dr. Heinly opined that the plaintiff had poor ability to perform several work activities, such as remember, understand, and carry out short, simple instructions; complete a normal work day; and work with others. (TR. 404-05). Dr. Heinly explained that the plaintiff's was "unable to work cooperatively

---

[5] A GAF score of forty-five indicates serious symptoms or difficulty functioning, bordering on major impairment in several areas. DSM 32.

8

with others due to mood swings and paranoia." (TR. 404).

In April 2004, psychiatrist Dr. M. Ralph Picciotto evaluated the plaintiff at the Commissioner's request. (TR. 415). Dr. Picciotto summarized the plaintiff's past drug and alcohol, family, and psychiatric histories and wrote a brief summary of the plaintiff's current problems and of his mental status examination. (TR. 415-16). The plaintiff stated that Seroquel helped her symptoms, but did not completely relieve them. (TR. 415). She reported having occasional panic attacks and hearing voices. (TR. 415). Dr. Picciotto reported that the plaintiff had good long and short term memory and good judgment. Dr. Picciotto opined that the plaintiff was moderately limited in interacting with co-workers, supervisors and the public, and slightly limited in carrying out detailed or complex instructions, and in responding to changes in a work setting. (TR. 417-18). Dr. Picciotto further opined that the plaintiff had no restrictions on her ability to understand, remember, and carry out short, simple instructions. (TR. 418). In his decision, the ALJ gave little weight to Drs. Heinly and Coronado's GAF scores and mental source statements and instead credited the opinion of Dr. Picciotto. (TR. 20).

At the January 2004 hearing, the plaintiff testified that she had violent outbursts and sometimes wanted to hurt people. (TR. 70-71). She also testified that she stayed in her house and didn't like being around people. *Id.* She testified that the interferon treatment she was receiving twice a week for hepatitis C gave her flu-like symptoms and made her fatigued. (TR. 73-74).

The plaintiff's Dauphin County mental health case worker, Christa Field,

testified as a lay witness. (TR. 61, 76, 83). Ms. Field testified that she had known the plaintiff for the previous year and seven months, and that she takes the plaintiff to her psychiatric appointments. (TR. 79, 81). Ms. Field also testified that the plaintiff would not be able to maintain attendance at work, took criticism poorly, acted out aggressively towards other people, and was incapable of using pubic transportation. (TR. 85-86). Finally, Ms. Field testified that the plaintiff's conduct was consistent with Dr. Heinly's description of it. (TR. 81).

At the May 2002 hearing, the plaintiff's daughter, with whom she lives, testified that the plaintiff could stand for only six or seven minutes before having to sit back down; that it took her all day to clean because of her slow pace; and that she had crying spells and "very frequent" incontinence. (TR. 50-52). The plaintiff's daughter did not testify at the January 2004 hearing.

## V. Discussion

### 1. Standard of Review

When reviewing the denial of disability benefits, we must determine whether the denial is supported by substantial evidence. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3rd Cir. 1988); *Mason v. Shalala*, 994 F.2d 1058 (3rd Cir. 1993). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552 (1988); *Hartranft v. Apfel*, 181 F.3d 358, 360. (3d Cir. 1999).

It is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The plaintiff contends that the ALJ erred in 1) evaluating lay witness testimony; 2) finding that the plaintiff's schizoaffective disorder did not meet or equal Listing 12.04; and, 3) formulating the hypothetical question to the VE.

### 2. Whether the ALJ erred in evaluating the testimony of the plaintiff's lay witnesses

The plaintiff contends that the ALJ failed to discuss and evaluate the testimony of both her mental health case worker, Ms. Field, who testified at

11

the second hearing, and her daughter, Nickia Young, who testified at the first hearing. (Doc. No. 11 at 7-8). The plaintiff contends that the ALJ did not fulfill his duty to fully analyze all of the non-medical probative evidence of record, including lay witness testimony that could potentially bolster the credibility of a plaintiff, found not credible. *Burnett v. Commissioner,* 220 F.3d 112, 122 (3d. Cir. 2000).

The plaintiff first argues that the ALJ erred in not discussing Ms. Young's testimony at the first hearing, held on May 2, 2002. As the Commissioner points out, however, the ALJ did previously address this May 2002 testimony in an August 2002 decision which is not under review. (Doc. No. 12 at 15; TR. 101-102). In that August 15, 2002 decision, the ALJ found not credible the plaintiff's daughter's May 2, 2002 testimony about her mother's crying spells, embarrassing incontinence problems, slowness doing housework, and inability to stand for more than five or six minutes and stand for more than twenty minutes. (TR. 49-52, 101, 102). Because the ALJ addressed Ms. Young's May 2002 testimony in his August 2002 decision, we find the plaintiff's argument that he should have addressed that testimony again in 2004, two years after it was heard, unconvincing.

The plaintiff next argues that the ALJ failed to adequately explain his decision to accord little weight to the testimony of the plaintiff's mental health case worker, Ms. Field. The ALJ cited Ms. Field's status as an unacceptable medical source under the Regulations, as his reason for discounting her opinion that the plaintiff met the requirements for Listing 12.04. (TR. 20).

12

This reason is indeed valid to the extent that Ms. Field attempted to testify as an expert, since Ms. Field, a case worker with a bachelor's degree, is not an acceptable medical source under the Regulations. (TR. 79). *See* 20 C.F.R.§ 416.913 (listing acceptable sources).

The problem with the ALJ's reasoning is that plaintiff did not offer Ms. Field as an expert, but as a lay witness. (TR. 83). *Burnett* calls for the ALJ to state some reason for disregarding a lay witness' testimony when that testimony could potentially have bolstered the credibility of a claimant found not credible. 220 F.3d at 122. Because, in the present case, the ALJ found the plaintiff not credible, he should have evaluated Ms. Field's testimony. *Id.* Thus, to the extent that Ms. Field's testimony about the plaintiff's disruptive and aggressive behavior, inability to use public transportation, and tendency to miss or cancel appointments could have bolstered the plaintiff's credibility about the impact of her mental impairment on her work ability, the ALJ should address it on remand.[6] (TR. 18, 81, 85-86).

### 3. Whether the ALJ erred in finding that the plaintiff's schizoaffective disorder did not meet or equal Listing 12.04

The plaintiff argues that the ALJ erred in not finding that her

---

[6]

Although the Commissioner twice insists that the ALJ did in fact address Ms. Field's testimony in a lay witness context, the Commissioner has confused Ms. Field with Ms. Young, the plaintiff's daughter, and the July 26, 2004 decision under review here, with the August 15, 2002 decision not under review. (Doc. No. 12 at 8; TR. 101). The Commissioner's citations are to the ALJ's August 2002 discussion of Ms. Young's January 2002 testimony. *Id.*

schizoaffective disorder met or equaled Listing 12.04, affective disorders. The ALJ found that the plaintiff's mental impairment did not meet the B or C criteria for the listing.[7] (TR. 17). Listing 12.04(B) requires that the symptoms described in (A), such as pervasive loss of interest in almost all activities, sleep disturbance, and decreased energy, result in at least two of the following:

> 1. Marked restriction of activities of daily living;
> 2. Marked difficulties in maintaining social functioning;
> 3. Marked difficulties in concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.04. The ALJ concluded that the record showed <u>mild</u>, not marked, restriction of activities of daily living; <u>mild to moderate</u>, not marked, restrictions in her social functioning abilities; <u>mild to moderate</u>, not marked, difficulties in concentration, persistence or pace; and no repeated episodes of decompensation. (TR. 17; Listing 12.04(B)).

It is the claimant's burden to show that her impairment meets all the criteria of a listing. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990). To do so, she must present medical findings equal in severity to all the criteria for the most similar listed impairment. *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992).

---

[7] The required level of severity for Listing 12.04 is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied. 20 C.F.R. pt. 404, subpt. P, app. 1, Listing 12.04.

The plaintiff contends that Dr. Coronado's opinion, as set out in his medical source statement form, and Dr. Heinly's psychiatric evaluation and medical source form show that the plaintiff had the requisite "marked" limitations. (Doc. No. 11 at 9; TR. 360-61, 365-69, 404-05, 78-86). Dr. Coronado opined that the plaintiff had marked restrictions in her abilities to understand and remember short, simple instructions and make judgments on simple work-related decisions. (TR. 360). Dr. Coronado further opined that the plaintiff had an extremely restricted ability to carry out short, simple instructions, understand, remember, and carry out detailed instructions, and interact with the public, supervisor, and coworkers. (TR. 361). Similarly, Dr. Heinly, opined that the plaintiff had poor ability to perform several work activities, such as remember, understand, and carry out short, simple instructions, complete a normal work day, and work with others. (TR. 404-05).

While form reports consisting mainly of checked boxes are considered "weak evidence at best," Mason v. Shalala, 994 F.2d 1058, 1065 (3d. Cir. 1993), a cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."[8]  *Plummer v. Apfel*, 186

---

[8]

While check-the-box forms are considered weak evidence, the Commissioner's glib characterizations of Drs. Coronado's and Heinly's opinions as ones where the psychiatrists simply "made checkmarks," (Doc. No. 12 at 9, 11, 12) strikes this court as disingenuous, as Dr. Picciotto's

F.3d 422, 429 (3d Cir.1999) (quoting *Rocco v. Heckler,* 826 F.2d 1348, 1350 (3d Cir.1987)). Standing alone, of course, forms like the ones Drs. Coronado and Heinly filled out are not substantial evidence. *Green v. Schweiker*, 749 F.2d 1066, 1071 n.3 (3d Cir. 1984). When the opinions contained in such forms are well-supported by medical signs and laboratory findings, however, they are due more weight. 20 C.F.R. § 404.1527(d)(3).

Here, the ALJ gave little weight to the plaintiff's treating psychiatrists opinions because he found them based not on clinical findings but on the plaintiff's allegations, which he found not credible. (TR. 20). Yet those allegations of sleep problems, auditory hallucinations, a fear and dislike of people, and urges to hurt people have been documented over a period of time by a number of treating sources, including the Dauphin County Mental Health/Mental Retardation Case Management Unit in late 2001, Edgewater Outpatient in 2002, Dr. Coronado since April 2002, and Dr. Heinly since June 2003. (TR. 341, 342, 346, 397-403, 360-61, 362-69, 408-11, 397-99). Furthermore, an ALJ may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not on the basis of his own credibility judgments, speculation or lay opinion. *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Kent*, 710 F.2d at 115. Here, by resting his evaluation of the validity of the treating physicians' opinions on his determination that the plaintiff was not credible, the ALJ improperly relied on

---

opinion regarding the plaintiff's work abilities, for which the Commissioner relied, is also on a check-the-box form, and all such forms are, of course, provided by the agency. (TR. 417-19).

speculation alone. *Plummer*, 186 F.3d at 429; *Adorno v. Shalala*, 40 F.3d, 43, 48 (3d. Cir. 1994). The rejection of medically credited psychological symptomatology based solely on the ALJ's observation of the claimant at the hearing is not permissible. *Frankenfield,* 861 F.2d at 408.

Instead of considering whether the treating psychiatrists' opinions were backed by medical findings, the ALJ credited the opinion of a one-time examining agency psychiatrist. (TR. 20). The ALJ found Dr. Picciotto's mental assessment more consistent with the plaintiff's medical record and treatment history. *Id.* While a state agency consultant is considered highly qualified and an expert in social security disability, 20 C.F.R. 416.927(f), "greater weight should be given to the findings of a treating physician than to a physician who has examined the claimant as a consultant." *Adorno,* 40 F.3d at 47; 20 C.F.R. § 416.927(d)(2).

### 4. **Whether the ALJ erred in formulating the hypothetical question to the VE**.

Finally, the plaintiff argues that the ALJ's hypothetical question was under-inclusive, making the VE's response inaccurate. (Doc. No. 11 at 12). The question included the assumption that the plaintiff had mild to moderate limitations in concentration and attention, and mild to moderate difficulty interacting with others. (TR. 88). The plaintiff contends that the mild to moderate limitations were not derived from any medical source, because Dr. Picciotto's report, dated almost three months after the hearing, did not yet exist. (TR. 61, 415). The plaintiff also contends that the ALJ did not define

"mild to moderate" for the VE and failed to mention the plaintiff's incontinence, the side effects of her interferon therapy, and her inability to go places unaccompanied by Ms. Field.  (Doc. No. 11 at 13; TR. 74, 81).

A hypothetical question which omits limitations supported by the record is defective and the answer thereto cannot constitute substantial evidence to support denial of a claim.  *Ramirez v. Barnhart*, 372 F.3d 546, 553-55 (3d Cir. 2004); *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987); *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984).  As previously discussed, the ALJ erred in rejecting the opinions of the plaintiff's treating psychiatrists on the basis of his own credibility judgment.  To the extent that, on remand, the ALJ re-evaluates the RFC findings of both physicians, the ALJ's conclusions should be incorporated into a new hypothetical question.

The ALJ's hypothetical also left out other factors.  The plaintiff's interferon treatment for hepatitis C, and the associated sickness and fatigue, is ongoing.  (TR. 74).  The ALJ also failed to mention to the VE the plaintiff's incontinence, about which she and her daughter testified at the May 2002 hearing, but not at the January 2004 hearing.  (TR. 42-44, 50-52).  The stated purpose of the January 2004 hearing was to collect additional testimony; the testimony regarding the plaintiff's incontinence remained a part of the record to be considered.  (TR. 63).  While we are not here reviewing the ALJ's August 15, 2002 decision, we find that, in light of the Appeals Council's instructions for the ALJ to re-evaluate the plaintiff's subjective complaints, the ALJ's failure to address the plaintiff's prior allegations of incontinence was in

18

error. (TR. 160-61). On remand, the ALJ should discuss the plaintiff's allegations of incontinence, evaluate their credibility, and if warranted, include the factor in the hypothetical question to the VE.

## VI. RECOMMENDATION

Based on the foregoing, it is recommended that the plaintiff's appeal from the decision of the Commissioner of Social Security be **GRANTED** and the case remanded for further proceedings and consideration consistent with this report.

S/ Malachy E. Mannion
**MALACHY E. MANNION**
**United States Magistrate Judge**

**Dated:** April 21, 2006
O:\shared\REPORTS\2005 Reports\05-1307 .01.wpd